**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MARCUS LYONS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 08 C 5063** |
| | ) | |
| | ) | **Judge Ronald A. Guzmán** |
| | ) | |
| **VILLAGE OF WOODRIDGE,** | ) | |
| **Woodridge Police Officers JAMES** | ) | |
| **GRADY and DON JANUS, as well as** | ) | |
| **OTHER UNKNOWN WOODRIDGE** | ) | |
| **POLICE OFFICERS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Marcus Lyons has sued Woodridge Police Officer James Grady, who is the only
remaining defendant, for depriving him of his constitutional right to due process under the
Fourteenth Amendment pursuant to 42 U.S.C. § 1983, as well as for malicious prosecution and
intentional infliction of emotional distress in violation of state law. Officer Grady has moved for
summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth
below, the Court denies the motion.

## Facts

Unless otherwise noted, the following facts are undisputed. On November 30, 1987 at
8:15 p.m., a man, who twenty years later would be identified as Carl Anderson, obtained entry to
Rebecca Auten's apartment by means of a ruse. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 1.) Once inside,
Anderson forced Rebecca to remove her robe, bra and underpants and to lie down on her living
room floor. (*Id.*) He then forcibly performed oral sex on her, had intercourse with her and
ejaculated onto her torso and chest. (*Id.* ¶ 2.) Anderson used a kitchen towel to wipe off

Rebecca's stomach and between her thighs, but not her chest or inside her vagina, and then left, taking the towel with him. (*Id.* ¶ 3.)

Immediately after the rape, Rebecca put on the silver-beige underpants (the "post-rape underpants"), bra and robe that she had been wearing before the attack. (*Id.* ¶ 4; Def.'s LR 56.1(a)(3) Stmt. ¶ 17; Def.'s Ex. X, Photo of Post-Rape Underpants.) After she put on the post-rape underpants and moved a cedar chest to block her front door, her underpants felt wet. (Def.'s LR 56.1(a)(3) Stmt. ¶ 17; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 23.) Rebecca then disrobed, leaving the post-rape underpants, bra and robe on the bathroom rug, and showered. (Def.'s LR 56.1(a)(3) Stmt. ¶ 18.) After showering, Rebecca put on a clean pair of blue underpants (the "hospital underpants") and clothes, and at approximately 9:00 p.m., she called her friend, Karen Jenicek. (*Id.*; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 46.) Rebecca and Karen talked for about two and a half hours prior to Karen's calling the police at 11:20 p.m. (Def.'s LR 56.1(a)(3) Stmt. ¶ 18.)

Officers Hoogland, Pugsley and Andrewski were first to arrive at the scene. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 26.) Rebecca told the officers about the rape, including the fact that the rape had occurred on the living room floor by the couch, not in the bathroom. (*Id.*) Rebecca took Officer Pugsley into the bathroom, where she identified a pile of clothing on the bathroom rug as the items of clothing she had worn after the rape until she had taken them off in order to shower. (*Id.* ¶ 27.) Officer Pugsley photographed the pile containing the post-rape underpants, bra and robe on the bathroom rug and then collected these items in a single paper bag. (*Id.* ¶ 28.)

Detective Grady arrived at the scene and spoke to Officers Hooglan and Pugsley, who briefed Grady on the details of what had happened before he arrived. (*Id.* ¶ 29.) Officer Hooglan, who had interviewed Rebecca, described the details of what Rebecca saw and did

before, during and after the rape. (Pl.'s Ex. 11, Grady Dep. 73, June 3, 2009.) Officer Pugsley

told Detective Grady that the evidence had been collected, and Detective Grady was aware that

Pugsley had collected Rebecca's undergarments and clothing from the bathroom. (Def.'s Resp.

Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 30; Pl.'s Ex. 11, Grady Dep. 194 ("[T]he undergarments and all

that were removed by the time I got there . . . ."); Pl.'s Ex. 25, Woodridge Police Department

Report at 000797; Pl.'s Ex. 26, Grady Dep. 64, Mar. 8, 2010 ("I was aware that Pugsley

collected items there. . . . I knew that he collected some clothing in the washroom.").)

   Officer Pugsley returned to the Woodridge police station, where he deposited the paper

bag containing the post-rape underpants, bra and robe into a property control locker. (Pl.'s LR

56.1(b)(3)(B) Stmt. ¶ 31.) In his evidence technician's report, dated November 30, 1987,

Pugsley stated that he had gathered the victim's "bathrobe and clothing which were on a bath

mat in bathroom" in a brown bag. (*Id.*; *see* Pl.'s Ex. 23, Evidence (describing bags).) According

to the property control locker inventory sheet, this evidence was labeled as "#7 bag with clothes"

and was located in Bin U-3. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 32.) Other than for court purposes,

that same report shows that the "#7 bag with clothes" was never checked out from Bin U-3.

(Pl.'s Ex. 22, 12/1/87 Evidence Description & Sign Out/In Sheet, at 000698.)

   Detective Grady drove Rebecca and Karen from the apartment to Edward Hospital,

where Rebecca was examined by a doctor. (Def.'s LR 56.1(a)(3) Stmt. ¶ 24.) Detective Grady

collected the sexual assault kit from the nurse at the hospital, in addition to the blue hospital

underpants that Rebecca had worn after her shower. (*Id.* ¶¶ 26-27.) The hospital underpants

were placed in a white bag separate from the kit. (*Id.*) Detective Grady took custody of the

white bag and the rape kit. (*Id.*; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 34.) The white bag and rape kit

were turned over to the property control locker. (Def.'s LR 56.1(a)(3) Stmt. ¶ 26; Def.'s Ex. K, at P178; Pl.'s Ex. 22, 12/1/87 Evidence Description and Sign Out/In Sheet.) The property control locker inventory list shows "#6 white bag" and "#8 1 rape kit" as evidence located in Bin U-3. (Pl.'s Ex. 22, 12/1/87 Evidence Description and Sign Out/In Sheet.)

Detective Grady knew that Officer Pugsley had collected the post-rape underpants that Rebecca had worn after the rape but before she showered and that Rebecca had not worn the hospital underpants until after she had showered and washed herself. (Pl.'s Ex. 26, Grady Dep. 63-65; see Pl.'s Ex. 11, Grady Dep. 5/11/09, at 255.) However, Grady submitted the hospital underpants, not the post-rape underpants, to the DuPage County Sheriff's Crime Lab. (Def.'s LR 56.1(a)(3) Stmt. ¶ 88.) Grady submitted an Evidence Submission and Analysis Request form that stated that he sought semen analysis on "1-BAG - PANTIES." The form indicates that the panties were submitted in a sealed and marked white bag. (Def.'s Ex. Q, DuPage County Sheriff's Records, at 13.)

On December 3, 1987, three days after Rebecca was raped, Detective Grady showed her a photo array in the presence of her friend, Karen. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 15.) The photo array showed five mug shots of men taken from the archive and Lyons' employee photo in which he is smiling and wearing a tie. (*See* Def.'s Ex. E, Photo Array.) Karen stated that it took five minutes for Rebecca to select Lyons' photo from the array. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 17.) In contrast, Detective Grady testified that Rebecca's identification of Lyons was "unhesitating." (*Id.* ¶ 18.) Every line-up and live identification made by Rebecca of Lyons was made after she had identified Lyons from the photo array. (*Id.* ¶ 20.)

In a report dated December 9, 1987, DuPage Sheriff Crime Lab analyst Christine Sahs stated that she found no traces of semen on the hospital underpants that had been submitted. (Def.'s LR 56.1(a)(3) Stmt. ¶ 89.) Although Sahs' notes indicated that the tested underpants were blue, Sahs' notes were never turned over to the police, the prosecution or defense counsel. (*Id.*; *see* Def.'s Ex. Q, DuPage County Sheriff's Records, at 17.) Sahs did not retain the hospital underpants for any further testing. (Def.'s Ex. K, DuPage County State's Attorney's Documents, at P180-81 (indicating that the tested underpants (labeled by Sahs as Exhibit K-16) were returned).)

As soon as Lyons became a suspect, he agreed to submit to certain physical tests, including hair combings and pluckings, a blood test and a saliva test because he "continuously maintain[ed] that he did not have any part in the assault." (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 36; Pl.'s Ex. 3, Trial Tr. 288.) Lyons' blood test results showed that he was a type B antigen secretor. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 37.) While Thomas Freeman, Lyons' defense attorney, knew that both the post-rape underpants and the hospital underpants had been collected as evidence, he agreed with the prosecutors that they would only test the rape kit and the underpants that Rebecca told the police she put on immediately following the rape because these items were the most likely to bear evidence of a rape. (*Id.* ¶ 69; Pl.'s Ex. 46, Freeman Dep. 42, June 18, 2010.)

On June 27, 1988, the date set for trial, Detective Grady checked out "all" evidence from the property control locker for court purposes. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 55; Pl.'s Ex. 28, Herron Dep. 52, Jan. 26, 2010.)[1] It is reasonable to infer that "all" evidence included the

---

[1]Although defendant attempts to deny parts of the fact statement in Pl.'s LR 56.1(b)(3)(B) ¶ 55, defendant's citations to the record do not support the denial. Accordingly this fact statement is deemed admitted.

hospital underpants because Sahs stated that the crime lab did not retain the hospital underpants for further testing and the property control locker inventory list indicates that the "#6 white bag" containing the hospital underpants was returned to the property control locker on January 5, 1988. (Def.'s Ex. K, DuPage County State's Attorney's Documents, at P180-81; Pl.'s Ex. 22, 12/1/87 Evidence Description and Sign Out/In Sheet.) The last known whereabouts of the hospital underpants is that they were in Grady's possession on June 27, 1988. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 64.) On June 27, 1988, Assistant State's Attorney Kathryn Creswell signed for all of the evidence checked out by Grady, except for the hospital underpants. (*Id.* ¶ 57.) Assistant State's Attorney ("ASA") Joseph Birkett did not recall whether the hospital underpants were ever delivered to the prosecution. (*Id.* ¶ 59.) Neither the evidence from the trial nor the hospital underpants were ever returned to the property control locker after trial. (*Id.* ¶ 63.)

At trial, the post-rape underpants, but not the hospital underpants that were analyzed at the laboratory, were entered into evidence. (*Id.* ¶¶ 60, 74; *see* Def.'s Ex. K, DuPage County State's Attorney's Documents, at 350.) The prosecution and defense stipulated at trial that the post-rape underpants were those that had been tested and designated K-16 in Sahs' report. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 70.) The post-rape underpants were admitted into evidence at trial as Exhibit 3, and the prosecution had Rebecca identify them as the ones that she had (1) worn after the rape, (2) felt were wet at the time, and (3) removed before showering and placed on the bath mat. (*Id.* ¶ 71.) Defense counsel Freeman's closing statement showed that he believed that the post-rape underpants were examined at the lab: "I think from your experiences in life, one might expect to find something in the crotch of the panties. Nothing was there. She said the first thing

she did was got back dressed. . . . She didn't launder them. She took them in, took it off and took her shower." (Pl.'s Ex. 50, Trial Tr. 40.) Then-ASA Kathryn Creswell states that she believed that Rebecca's post-rape underpants recovered from her apartment were examined at the lab. (Pl.'s Ex. 24, Creswell Dep. 77, May 22, 2009.) Birkett understood that the underpants that were tested were collected at the scene of the rape and that the underpants showed no evidence of semen. (Pl.'s Ex. 45, Birkett Dep. 14, June 10, 2009.) In his closing rebuttal argument, then-ASA Birkett stated that "the panties [Rebecca] had on after this guy forced his penis in her" were tested and found "weak for blood." (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 75.)[2] Grady was present at Lyon's trial for closing arguments, and thus heard both parties argue, incorrectly, that the post-rape underpants were tested and found not to contain semen. (*Id.* ¶ 78.) Although Grady admits he knew that information was false, at no point during closing arguments or afterwards did Grady tell the prosecutors or defense counsel that the post-rape underpants were never tested and that hospital underpants were the only underpants tested and found negative for semen and weak for blood. (*Id.*)

In 2006, after living with a wrongful rape conviction for almost two decades, Lyons became aware of an Illinois statute that permitted post-conviction testing of evidence. (*Id.* ¶ 97.) He hired a lawyer, who succeeded in winning the State's Attorney's support of a plan to perform DNA testing of two exhibits from his criminal trial, the bra and the underpants worn by Rebecca immediately after the rape. (*Id.*) The DuPage County Crime Laboratory performed DNA testing

---

[2]During his second deposition, Birkett testifies that he knew all along that the post-rape underpants introduced at trial were never tested and that the hospital underpants that were never introduced at trial were tested at the lab. (Def.'s Ex. J, Birkett Dep. 44, Mar. 17, 2010.) The conflict between Birkett's testimony at his first deposition (Pl.'s Ex. 45, Birkett Dep. 14), the statements made during his closing rebuttal argument (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 75) and his testimony at his second deposition (*id.* ¶ 81; Def.'s Ex. J, Birkett Dep. 44) cannot be resolved on a summary judgment motion.

on a semen deposit found on the bra and the test results excluded Lyons.  (*Id.*)  Based on the DNA test results, the State's Attorney supported Lyons' motion to vacate his conviction.  (*Id.* ¶ 98.)  The State's Attorney also supported Lyons' petition for clemency based on innocence, which the Governor granted.  (*Id.*)

During the instant litigation, on May 22, 2010, serologist expert Brian Wraxall tested the semen on the post-rape underpants for the presence of ABO secreted antigens, the same test that could and would have been performed in 1987, and found the presence of A antigen, but not B antigen.  (*Id.* ¶ 86.)  The presence of A antigen on the post-rape underpants eliminates Lyons as the rapist, and would have eliminated him in 1987 or 1988.  (*Id.* ¶ 87.)  Even now, visual examination of the post-rape underpants under UV light, the same method employed in 1987, still reveals the presence of six fluorescent areas that show the presence of semen on the post-rape underpants.  (*Id.* ¶ 85.)  Then-ASA Birkett concedes that "there wouldn't have been a prosecution if somebody else's [sperm was present on Rebecca's clothing]."  (*Id.* ¶ 88.)

## Discussion

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To support whether a fact can be or is in genuine dispute, a party must either "(A) cit[e] to particular parts of materials in the record, including depositions, . . . affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials; or (B) show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

Moreover, the court "construe[s] all facts and draw[s] all inferences in the light most favorable to the non-moving party." *Srail v. Vill. of Lisle*, 588 F.3d 940, 943 (7th Cir. 2009). "The existence of merely a scintilla of evidence in support of the non-moving party's position is insufficient; there must be evidence on which the jury could reasonably find for the non-moving party." *Delta Consulting Group, Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1137 (7th Cir. 2009).

## I. *Brady* Claim

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . ." 42 U.S.C. § 1983. To bring a claim under § 1983, plaintiff must establish that: (1) he has been deprived of a federal right, (2) by a person acting under color of state law. *See Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001).

Lyons claims that Grady deprived him of due process by withholding material exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). *Brady* is violated if: "(1) the evidence at issue is favorable to the accused, either being exculpatory or impeaching; (2) the evidence . . . [was] suppressed by the government, either willfully or inadvertently; and (3) there is a reasonable probability that prejudice ensued– in other words, 'materiality.'" *Carvajal v. Dominguez*, 542 F.3d 561, 566-67 (7th Cir. 2008); *see Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). "[T]he plaintiff must allege that the officer[] withheld information or

evidence necessary for the fair and impartial trial guaranteed by the U.S. Constitution." *Ienco v. City of Chi.*, 286 F.3d 994, 998-99 (7th Cir. 2002); *see Newsome v. McCabe*, 256 F.3d 824, 825 (7th Cir. 2001); *Jones v. City of Chi.*, 856 F.2d 985, 994 (7th Cir. 1988). The *Brady* "duty to disclose extends throughout the legal proceedings that may affect either guilt or punishment, including post-conviction proceedings." *Steidl v. Fermon*, 494 F.3d 623, 630 (7th Cir. 2007).

In the criminal context, *Brady* applies whether the suppression of evidence is willful or inadvertent, but in the context of a section 1983 claim, three circuits have held that a higher level of culpability than inadvertence is required. *Compare Strickler*, 527 U.S. at 280 (*Brady* claim requires willful or inadvertent suppression), *with Porter v. White*, 483 F.3d 1294, 1311 (11th Cir. 2007) (section 1983 *Brady* claim requires reckless suppression), *Villasana v. Wilhoit*, 368 F.3d 976, 980 (8th Cir. 2004) (section 1983 *Brady* claim requires police officer's bad faith suppression), *and Jean v. Collins*, 221 F.3d 656, 660-61 (4th Cir. 2000) (divided en banc court stating that section 1983 *Brady* claim requires police officers' bad faith suppression). The Seventh Circuit has not yet ruled on the minimum required level of culpability to establish a section 1983 *Brady* claim against a police officer. *But see Newsome v. McCabe*, 260 F.3d 824, 825 (7th Cir. 2001) (citing *Jean* and stating that "police who deliberately withhold exculpatory evidence, and thus prevent the prosecutors from complying with the obligations articulated in *Brady*, violate the due process clause" without discussing whether any lesser degree of culpability, such as recklessness, would suffice). Nor has the Supreme Court, though it has held, albeit not within the *Brady* context, that mere negligence is insufficient to support a Fourteenth Amendment due process clam. *Daniels v. Williams*, 474 U.S. 327, 332 (1986). However, in this case, the Court need not decide whether inadvertent suppression can support a § 1983 claim

because, for reasons discussed below, Lyons has create a triable issue as to whether Grady suppressed the evidence deliberately.

Grady asserts that he should be afforded qualified immunity as to Lyons' *Brady* claim. "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "We engage in a two-part inquiry in civil rights actions to assess whether a defendant is entitled to qualified immunity." *Finsel v. Cruppenink*, 326 F.3d 903, 906 (7th Cir. 2003). A court determines whether, taken in the light most favorable to the plaintiffs, "the facts show that the official's conduct violated a constitutional right." *Id.* "If a constitutional right is violated, we next determine whether it was clearly established at the time of the alleged violation." *Id.*

Thus, the Court must determine whether the facts suggest that Grady violated Lyons' due process rights by suppressing evidence that the post-rape underpants were not tested prior to trial and that Rebecca took five minutes to identify Lyons from a photo array.

First, Lyons has raised a triable issue as to whether this evidence is exculpatory or impeaching. Evidence that the post-rape underpants were never tested prior to trial would have been favorable to Lyons because it would have: (1) dispelled the prosecution and defense counsel's belief that the post-rape underpants had already been tested (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 69; Pl.'s Ex. 46, Freeman Dep. 42);[3] (2) impeached the trial testimony of Officer Pugsley, Detective Grady and Crime Lab Analyst Sahs by allowing defense counsel to ask why

---

[3] If a jury believes plaintiff's version of events, it would also dispel the prosecution's belief that the post-rape underpants had already been tested. See more discussion, *infra*.

the government had not tested the post-rape underpants that Rebecca wore immediately after the rape (and that Rebecca stated felt "wet") and instead tested the hospital underpants that she wore after showering, (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 69 ¶¶ 23-31); and (3) caused both the prosecution and defense counsel to seek laboratory testing of the post-rape underpants using the methodology available at the time that would have excluded Lyons as a suspect due to the presence of the A, but not B, antigen (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 69, 84-88). Further, evidence that the victim took five minutes to identify Lyons from the photo array would have been favorable to Lyons because it would have enabled defense counsel to impeach Detective Grady's testimony that Rebecca's identification of Lyons was "unhesitating." (*Id.* ¶ 18.) Accordingly, this evidence qualifies as advantageous to Lyons.

Grady argues, however, that the record shows he did not withhold from prosecutors the evidence that the post-rape underpants were not tested before trial.[4] Specifically, Grady relies on Birkett's second deposition in which Birkett states that prior to trial, he was aware that only the hospital, but not the post-rape, underpants were tested and that only the post-rape, but not the hospital, underpants were introduced as evidence at trial. (Def.'s LR 56.1(a)(3) Stmt. ¶¶ 103-04.) There is evidence in the summary judgment record, however, that contradicts Birkett's statement. First, in his closing rebuttal argument, then-ASA Birkett stated that "the panties [Rebecca] had on after this guy forced his penis in her" were tested and found "weak for blood." (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 75.) Second, during his initial deposition in this case, Birkett testified that the underpants that were tested were those collected at the scene of the rape and that the underpants showed no evidence of semen. (Pl.'s Ex. 45, Birkett Dep. 14.) Third, statements

---

[4]However, Grady does not argue that the prosecution was aware that Rebecca took five minutes to identify Lyons from the photo array.

of defense counsel at trial and then-ASA Creswell during her deposition support an inference that neither defense counsel nor the prosecution was aware that the post-rape underpants had not been tested.  (Pl.'s Ex. 50, Trial Tr. 40; Pl.'s Ex. 24, Creswell Dep. 77; *see* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 69 (stating that before trial, defense counsel had specifically sought testing of the post-rape underpants); Pl.'s Ex. 46, Freeman Dep. 42 (stating that defense counsel and prosecutors agreed to test the post-rape underpants); *see also* Pl.'s Ex. 35, Def.'s Resp. Request Admit ¶ 9 (Grady's admitting that post-rape underpants tested in 2006 are the same panties identified as "submission 02" and "Exhibit K-16" in Christine W. Sahs' letter to Woodridge Police Department, dated December 9, 1987).)  Given the conflicting evidence as to this material fact, the Court holds that it is inappropriate to grant summary judgment as to Lyons' *Brady* claim based on the evidence that the post-rape underpants were not tested.

Further, Grady argues that evidence that the post-rape underpants were never tested before trial was not "suppressed" because defense counsel could have tested the post-rape underpants.[5]  For purposes of *Brady*, evidence is suppressed "if (1) the prosecution failed to disclose the evidence before it was too late for the defendant to make use of the evidence, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence."  *United States v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002).

Viewing the evidence favorably to Lyons, a rational jury could find that Grady deliberately withheld the hospital underpants from the prosecutors to conceal the fact that he had

---

[5]In contrast, Grady does not argue that he did not suppress evidence that Rebecca took five minutes to identify Lyons from the photo array or that the suppression was not material. Although Grady argues that he testified at trial that Rebecca's identification of Lyons was "unhesitating," this merely creates a triable issue as to whether his or eyewitness Karen Jenicek's version of events is to be believed.  (*Compare* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 17-18, *with* Def.'s Resp. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 17-18.)

tested the wrong underpants and/or to curry favor with the DuPage County State's Attorney's Office, with which he sought employment, by helping it obtain a conviction. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 55, 57, 59; Def.'s Ex. K, DuPage County State's Attorney's Documents, at P180-81; Pl.'s Ex. 22, 12/1/87 Evidence Description and Sign Out/In Sheet. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 89-94 (stating that around the date of Lyons' trial, Grady sought employment with an agency that he believed was a division of the DuPage County State's Attorney's Office that would contact two DuPage County ASAs who served on the agency's board as references.) Only Grady knew that Officer Pugsley, defense counsel Freeman and then-ASA Birkett's representations at trial that the post-rape underpants had been tested were false because he knew that he had sent only the hospital underpants to the laboratory for testing. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 55, 57, 59, 72, 73, 75-76, 78; Def.'s LR 56.1(a)(3) Stmt. ¶¶ 88-89.) Further, a reasonable fact finder could infer that Grady did not tell the prosecution that Rebecca hesitated for five minutes before identifying Lyons from the photo array because without any physical evidence to tie Lyons to the rape, the manner of Rebecca's initial identification of Lyons was pivotal to the case. (*Id.* ¶¶ 17-18.) Grady never revealed the suppressed evidence before trial, at trial or at any time thereafter. Thus, a rational jury could find that Grady deliberately suppressed evidence in such a way that Lyons could not make use of it.

A reasonable jury could also find that evidence that the post-rape underpants were not tested before trial was not "otherwise available" to Lyons through the exercise of reasonable diligence because his counsel had agreed with the prosecution that only the rape kit and the post-rape underpants would be tested at the laboratory. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 69; Pl.'s Ex. 46, Freeman Dep. 42, June 18, 2010.) Based on the agreement, defense counsel and the

prosecution stipulated at trial that the post-rape underpants were those that had been tested and designated K-16 in Sahs' report. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 70.)[6] Such a fact finder could determine that Lyons' counsel had exercised reasonable diligence in relying on, and trusting, the prosecution to honor that agreement.[7]

Third, Lyons has raised a genuine issue of fact regarding whether there is a reasonable probability that the suppression of the evidence prejudiced him. "A *Brady* violation . . . requires 'materiality' of the evidence withheld, which 'in the *Brady* context is the same thing as prejudice.'" *Harris v. Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2007 (quoting *United States v. Wilson*, 481 F.3d 475, 480 (7th Cir. 2007)). Prejudice exists when the defendant "is unduly surprised and lacks an adequate opportunity to prepare a defense, or when the violation substantially influences the jury." *United States v. De La Rosa*, 196 F.3d 712, 716 (7th Cir. 1999). "In performing the materiality analysis, courts are to consider the cumulative effect of all the suppressed evidence, as opposed to considering each piece alone." *Phillips v. Allen*, 743 F. Supp. 2d 931, 948 (N.D. Ill. 2010). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). In other words, *Brady* materiality "is not a sufficiency of evidence test." *Id.* Rather, the plaintiff must show that "that the favorable evidence could

---

[6]It is undisputed that the prosecution, not defense counsel, physically handled the post-rape underpants at trial when Rebecca and Officer Pugsley identified them and when the prosecution admitted them into evidence. (*Id.* ¶¶ 71-72.) Therefore, a rational jury could find that it was not obvious to defense counsel that the post-rape underpants had not been tested, just as it had not been obvious to either the prosecution or Officer Pugsley.

[7]Grady does not argue that evidence of Rebecca's hesitation at the photo array identification was otherwise available to Lyons.

reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435.

Lyons has created a triable issue as to whether the cumulative effect of the suppressed evidence was prejudicial. Had the jury known that the government tested the hospital underpants, which were significantly less likely to contain relevant serological evidence, rather than the post-rape underpants, it would likely have questioned the validity of the government's case, especially given that the defendant had voluntarily provided blood samples, was persistent in asking about the lab results, and consistently maintained that he was innocent. Further, had the jury known that Rebecca had hesitated for five minutes before identifying Lyons from the initial suggestive photo array, rather than doing so instantaneously, it would likely have questioned whether all of her subsequent identifications of him were tainted by the photo array identification. In sum, viewing the disputed facts in Lyon's favor, a reasonable jury could find that, together, the suppression of evidence that the post-rape underpants were not tested prior to trial and that Rebecca hesitated for five minutes before identifying Lyons from the initial photo array puts the case in an entirely different perspective so that confidence in the verdict is sufficiently impaired.

Therefore, the Court holds that when the summary judgment record is viewed in Lyons' favor, it shows that Grady's conduct violated Lyons' constitutional right to a fair trial. This is not to say that Grady, in fact, violated Lyons' *Brady* rights. It is merely to say that a jury could find that Grady concealed from the prosecutors, as well as misrepresented to them, facts likely to influence the decision whether to continue prosecuting him. Thus, Lyons has satisfied the first element of the qualified immunity analysis.

Next, the Court addresses the second element of the qualified immunity test: whether the right was clearly established at the time of the alleged violation. *Wilson v. Layne*, 526 U.S. 603, 609 (1999). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [public official] that his conduct was unlawful in the situation he confronted." *Id.* at 202. Although qualified immunity is a defense to a section 1983 suit, the plaintiff bears the burden of establishing the two elements of the qualified immunity test. *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999).

It was clearly established in 1987 and 1988 that police could not withhold from prosecutors exculpatory information. "The *Brady* principle was announced in 1963." *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001); *see Brady*, 373 U.S. at 87. The Seventh Circuit has held that it was clearly established as early as 1979 and 1980 that *Brady* applied to officers who withhold exculpatory or impeaching information. *Newsome*, 256 F.3d 747, 752-53; *see Chavis v. Rowe*, 643 F.2d 1281, 1286 (7th Cir. 1981). Accordingly, Lyons has met his burden of establishing the two elements of the qualified immunity test.

In sum, the Court denies defendant's motion for summary judgment as to Lyons' *Brady* claim. Given the disputed facts in the record and the reasonable inferences drawn therefrom, a jury must determine whether Grady or Lyons' version of events is more believable.

## II. Malicious Prosecution

To prove a malicious prosecution claim under Illinois law, the plaintiff must establish: "(1) the defendant commenced or continued an original criminal or civil judicial proceeding; (2) the proceeding terminated in favor of the plaintiff; (3) there was an absence of probable cause

for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff."
*Hurlbert v. Charles*, 938 N.E.2d 507, 512 (Ill. 2010). When a plaintiff brings a malicious
prosecution claim against police officers, plaintiff must show "more than a lack of probable
cause; rather, he must allege that the officers committed some improper act after they arrested
him without probable cause, for example, that they pressured or influenced the prosecutors to
indict, made knowing misstatements to the prosecutor, testified untruthfully, or covered up
exculpatory evidence." *Cf. Snodderly v. R.U.F.F. Drug Enforcement Task Force*, 239 F.3d 892,
901 (7th Cir. 2001). "Probable cause is defined as 'a state of facts that would lead a person of
ordinary caution and prudence to believe, or to entertain an honest and strong suspicion, that the
person arrested committed the offense charged.'" *Mosley v. City of Chi.*, 614 F.3d 391, 399 (7th
Cir. 2010) (quoting *Reynolds v. Menard, Inc.*, 850 N.E.2d 831, 837 (Ill. App. Ct. 2006)). A court
"look[s] to the totality of the circumstances when considering whether the officers had probable
cause." *Id.*; *Ill. v. Gates*, 462 U.S. 213, 231 (1983). "Moreover, a mistake or error that is not
grossly negligent will not affect the question of probable cause in an action for malicious
prosecution when there is an honest belief by the complainant that the accused is probably guilty
of the offense." *Johnson v. Target Stores, Inc.*, 791 N.E.2d 1206, 1219 (Ill. App. Ct. 2003)
(citation omitted). The probable cause necessary to continue the prosecution of a defendant after
the complainant signs the criminal complaint dissipates when the complainant's belief that
defendant committed a crime is unreasonable under the circumstances. *Id.* at 1220.

First, Grady argues that there was probable cause to arrest Lyons, and therefore there was
probable cause to prosecute him. Plaintiff argues that Grady did not have probable cause to
continue the judicial proceedings through the conclusion of the trial.

Lyons has created issues of fact for the jury regarding whether Grady's belief that Lyons committed the crime was reasonable given the following undisputed facts, as well as disputed facts viewed in Lyons' favor:  (1) Rebecca hesitated a full five minutes before identifying Lyons from a suggestive photo array that contained five mug shots and a photo of Lyons smiling while wearing a white shirt and tie, which calls into question her subsequent identifications of him; (2) Lyons volunteered to provide all of the hair and blood samples that the police requested and repeatedly requested the results of the lab analysis because he insisted that he was innocent; (3) Grady knew that Officer Pugsley had collected items of clothing (including the post-rape underpants) Rebecca wore immediately after the rape before Grady arrived on the scene; (4) Grady tested the hospital underpants worn after Rebecca showered rather than the post-rape underpants; and (5) after checking all of the evidence out of the property control locker, Grady only delivered the untested post-rape underpants to the prosecution as evidence for trial, leading the prosecution and defense counsel to believe that the post-rape underpants had been examined by the laboratory.  Whether any suppressed evidence would have influenced the decision to continue the prosecution of Lyons is a factual question for the jury.

In addition, Grady argues that even if the above facts require a trial, Lyons' failed polygraph, Lyons' changing alibis and the identification of Officer Schnitzlein's composite drawing by Donna Reilly (now Stroberg) and Laura Pekich are sufficient to provide probable cause for the continued prosecution of Lyons.  The Court addresses each in turn.

First, unfortunately for Grady, under Illinois law, "polygraph examinations may not be utilized in a determination of probable cause."  *People v. Allen*, 620 N.E.2d 1105, 1014 (Ill. App. Ct. 1993).  Accordingly, the Court does not consider the failed polygraph in determining whether

a reasonable person in Grady's shoes would have believed that Lyons committed the offense charged.

Second, Grady avers that Lyons gave conflicting alibis in an interview conducted by then-ASA Brian Telander. Lyons disputes that he gave any conflicting alibis with regard to the time of the rape. (Pl.'s LR 56.1(b)(3)(A) Stmt. ¶ 81; Def.'s Ex. N, Lyons Dep. at 99-100.) The rape occurred at 8:15 p.m. on November 30, 1987 and the only variances in Lyons' account of what happened that day concerned what he did during the morning and afternoon hours of November 30, 1987. (*See* Def.'s Ex. K, DuPage County State's Attorney's Documents, at P318-20.) Lyons consistently stated that he was home alone during the evening. (*See id.*) Accordingly, a question of fact exists regarding whether any conflict in Lyons' account of his whereabouts during the morning and afternoon of November 30 supported a reasonable, honest belief that he was probably guilty of the rape.

Third, given the state of the summary judgment record, the Court is unable to determine what effect the composite drawing had on the existence of probable cause. Viewing all of the evidence in Lyons' favor, the record shows that: (1) there are two composite sketches of the rapist, but no evidence showing which of the sketches, if either, is the one referred to by Officer Schnitzlein, Stroberg or Pekich (*see* Def.'s Ex. C, Schnitzlein Composite (unmarked and unsigned); Def.'s Ex. D, Blow Up of Schnitzlein Composite (unmarked and signed and dated 4/11/88); (2) the victim could not remember giving a description to Officer Schnitzlein (Pl.'s Ex. 60, Auten Dep. 6/15/09 at 29), (3) Grady told Stroberg that, due to the victim's being upset, the victim was unsure what the assailant looked like and could not remember everything about him when the composite was made (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 30; Pl.'s Ex. 8, Stroberg Dep. at

31, 37); and (4) Grady did not rely on the composite to establish probable cause before the grand jury  (Pl.'s Ex. 18, Grand Jury Tr. at 2-9).  Due to the disputed facts before the Court, it is up to a jury to determine what effect, if any, the composite had on whether a reasonable person in Grady's position would have honestly believed that Lyons had probably committed the rape.  In sum, the Court's holding does not mean that the composite, together with the other evidence, did not constitute probable cause to continue to the prosecution.  It simply means that it is an issue for a jury to determine.

Next, Grady argues that Lyons has failed to establish a triable issue as to malice because Grady did not know Lyons prior to his criminal case.  "[A] plaintiff may demonstrate malice by showing that the [defendant] proceeded with the prosecution for the purpose of injuring plaintiff or for some other improper motive." *Aguirre v. City of Chi.*, 887 N.E.2d 656, (Ill. App. Ct. 2008).

As discussed above, there is sufficient evidence in the record upon which a reasonable fact finder could infer that Grady deliberately omitted the hospital underpants from the evidence turned over to the prosecution for trial to:  (1) prevent discovery that he had tested the wrong underpants, (2) strengthen the case against Lyons to help the DuPage County State's Attorney's Office obtain a conviction, and (3) increase the likelihood that Grady would obtain a job with an agency shortly after Lyons' trial that he believed was a division of the DuPage County State's Attorney's Office.  (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 55, 57, 59; Def.'s Ex. K, DuPage County State's Attorney's Documents, at P180-81; Pl.'s Ex. 22, 12/1/87 Evidence Description and Sign Out/In Sheet.  *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 89-94 (stating that around the date of Lyons' trial, Grady sought employment with an agency that he believed was a division of the DuPage

County State's Attorney's Office that would contact two DuPage County ASAs who served on the agency's board as references.) As such, whether there was an improper motive in this case is a question for the jury.

### III. Intentional Infliction of Emotional Distress ("IIED")

Under Illinois law, the elements of a cause of action for intentional infliction of emotional distress are as follows:

> First, the conduct involved must be truly extreme and outrageous. Second, the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that this conduct will cause severe emotional distress. Third, the conduct must in fact cause severe emotional distress.

*McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988).

To be extreme and outrageous, defendant's conduct must go beyond "mere insults, indignities, threats, annoyances, petty oppressions or trivialities." *Pub. Fin. Corp. v. Davis*, 360 N.E.2d 765, 767 (Ill. 1976). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Id.* If "a state official . . . concealed exculpatory evidence[, it] would be sufficiently outrageous to support an IIED claim." *Fox v. Tomczak*, No. 04 C 7309, 2006 WL 1157466, at *6 (N.D. Ill. Apr. 26, 2006) (internal quotations omitted).

Grady argues that plaintiff's IIED claim fails because Grady did not withhold critical evidence, and as such, Lyons has failed to establish a triable issue as to whether his conduct was extreme and outrageous. As discussed above, Lyons has successfully created a triable issue as to whether Grady concealed the exculpatory evidence that the victim hesitated for five minutes

before initially identifying Lyons from the photo array and that the post-rape underpants were never tested. Because this is Grady's sole argument to defeat Lyons' IIED claim, it necessarily fails. Accordingly, the Court denies Grady's motion for summary judgment as to this claim.

## Conclusion

For the reasons stated above, the Court denies Grady's motion for summary judgment. The parties shall be prepared to set a trial date and a date for the filing of the final pretrial order at the status hearing set on June 22, 2011 at 9:30 am.

**SO ORDERED**                                   **ENTERED:**

June 8, 2011

_Ronald A. Guzman_

_____

**HON. RONALD A. GUZMAN**
**U.S. District  Judge**